ESTATE OF Guy L. MANN, Deceased.

Suzanne Mann DUVAL, Administratrix, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 82–1593.

United States Court of Appeals, Fifth Circuit.

May 4, 1984.

Glen L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Sec., Ann Belanger Durney, Robert S. Pomerance, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Durant, Mankoff, Davis, Wolens & Francis, Charles D. Pulman, Davis, Meadows, Owens, Collier & Zachry, C.M. Meadows, Jr., Dallas, Tex., for plaintiff-appellee.

Before BROWN, WISDOM and JOHN-SON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Our case today involves loans between a broker and a businessman—two brothers, in two businesses related almost as closely. Because of one bankruptcy, and no bucks, the broker loaned the businessman several million dollars. These loans ultimately were the basis of a bad business debt de-

duction under I.R.C. § 166, and the resulting tax refund under § 172, filed on behalf of the broker. The jury allowed the claim. The Government argues alternatively that the lending brother was merely being "generes," that he was just protecting his investment, and that the debts were never as bad as they initially appeared. Unpersuaded by these assertions, we affirm the jury's verdict. The Government also appeals the Court's finding below that it should not recoup a share of the refund award. Essentially on the basis of that Court's well-reasoned opinion, we again affirm.

## I. Background

The facts and circumstances leading up to this suit are of critical significance to its resolution.

### Two Brothers

Guy L. Mann (the taxpayer), now deceased, was the younger and only brother of Gerald C. Mann (Mann). Both attended and graduated from SMU in Dallas, Texas in the mid-1920s. There, (Gerald) Mann became an all-American football player. They went to law school—Mann at Harvard, the taxpayer at SMU—and then practiced law together in Dallas. In 1935, Mann was appointed Secretary of State and, later, elected to several terms as Attorney General of Texas. He returned to private law practice in 1944.

### Two Businesses

In that year, the taxpayer began a career as a "broker" of businesses. As a broker, the taxpayer was a financial matchmaker. He brought together owners of companies that were willing or who could be persuaded to sell and prospective suitors ready and able to buy. If the meeting led to a courtship, and the courtship to a sale, the taxpayer and his partner were compensated. Usually, they were paid in cash; some-

times they received stock. But if nothing developed, nothing was earned.

These deals were sporadic. Although the taxpayer actively promoted the corporate courtships, he generally was not involved in the actual sale negotiations. In major deals, even successful negotiations often took up to a year to come to fruition. That, and the time commitment of these major deals, limited the number which the taxpayer could broker.

The taxpayer's first deals involved Clint Murchison, a Dallas businessman of considerable wealth. In 1944, the taxpayer and an associate arranged a meeting between Murchison and representatives of five bus lines—Dixie Motor Coach Corporation, Sunshine Bus Line, Airline Motor Coaches, Texas Motor Coaches, and Union Bus Line. Murchison ultimately bought the companies, and the taxpayer shared a commission of $75,000. Later, in the early 1950s, the taxpayer also brokered Murchison's acquisition of the Simi Valley Development Company and, in the mid-1950s, the Bamburger Railroad Company. For the Bamburger Railroad deal, he and an associate received common stock in the railroad.

Shortly after his return from government service in 1944, Mann had also become associated with Murchison. Murchison, Mann, and a woman by the name of Hill, subsequently formed the Murmanill Corporation. From the beginning, Murmanill was a corporate parent—a company which bought companies on credit.[1]

Eventually, Mann and Murchison parted ways in 1958. Mann retained control of Murmanill and became chairman of its board and chief executive officer. Murmanill continued to expand through its highly-leveraged corporate acquisitions.

The nascent relationship between the taxpayer—the business bride-finder—and Murchison's polygamous Murmanill solidified with Mann at the helm.[2] The taxpayer

1. It was through Murmanill that Murchison acquired the Simi Valley Development and Bamburger Railroad companies.

2. In fact, the taxpayer had brokered Mann's split from Murchison in 1958, by finding an investor willing to step in for Murchison as a substantial shareholder of Murmanill. This al-

soon brokered a deal with Mann in 1959 in which Murmanill purchased the Glasscock Tidelands Oil Company, a publicly-held corporation. The same year, Glasscock Tidelands became Diversa Incorporated. Diversa, Murmanill, and a company named Inwood Securities became Mann's intertwined holding organization. Through Diversa[3] (the active entity of the three), Mann ultimately acquired over 30 companies, with operations involving oil and gas, real estate, apparel, computers, insurance, restaurants, animal feeds, and African diamond mines.

As the conglomerate grew during the late 1950s and mid-1960s, the taxpayer was involved in many of its major transactions. He brokered Diversa's acquisition of the Apparel Corporation, which became a major Diversa subsidiary, and the Southern Athletic Company. On this deal, he and his associate received a $30,000 commission. The Glasscock Tidelands deal in 1959 also included the Tidelands Drilling Company and certain associated companies. For this transaction, he shared a $75,000 commission. He brokered deals involving Bonanza International Incorporated and the Beautron Corporation. In 1962, he brokered the Texas Electronics Products Corporation transaction. In his largest deal, he brokered the acquisition of the Western Grain Company in 1964 or 1965, which also became a major subsidiary of Diversa. He shared a $150,000 commission for his work. Moreover, because he helped secure financing for the deal, he and his associate earned an additional $100,000 fee.

The taxpayer was also the intermediary in a deal in the mid-1960s involving the University Computing Company. University Computing was in immediate need of financial backing for an expedited purchase of its first large computer. The company turned to the taxpayer to find such a backer. He went to Diversa. Diversa agreed to guarantee the $600,000 loan in return for a majority interest in the company. The fledgling computing firm paid the taxpayer in its own stock for his part in the deal. University Computing prospered over the next few years. In 1968, the taxpayer sold half of this stock commission (which he had left after a 1967 divorce settlement) and earned $5.6 million. Such was the brokering business.

### One Bankruptcy

Unfortunately, the success initially enjoyed by the holding company was fleeting. The organization was undercapitalized from its inception, and, as we have said, its acquisitions were highly leveraged. In 1967–68, interest rates rose, and Diversa came under increasing financial strain. It was unable to obtain the credit necessary to (and responsible for) its existence. Moreover, Mann made some managerial errors, including a few ill-advised and costly acquisitions. Slowly, the large organization began collapsing under the weight of Mann's ambitions. To stave off creditors, he and his son (Mann Jr.), who was also an officer in the organization, began divesting Diversa of its best subsidiaries.

For over 20 years, Murmanill and then Diversa had been directly involved in the taxpayer's brokerage successes. He had earned commissions of both stock and cash that had made him a wealthy man. Even as the holding company crumbled, the taxpayer continued to approach Mann with ideas for new and possibly profitable ventures.[1]

In its time of crisis, the quickly-fading organization sought out the taxpayer's help. He responded with a series of loans and loan guarantees, directly to Diversa, Murmanill, and Inwood Securities and indirectly to them, through Mann and Mann Jr. From 1967 through 1970, the loans—both

---

lowed Mann to take independent control of the company.

**3.** During the years relevant to this case, Mann held a substantial, usually controlling, interest in that publicly-held company.

**4.** For example, in 1970 he urged Mann to commit Diversa to an oil drilling project on the Washburn Ranch in South Texas. With his organization strapped to maintain the companies it already had, Mann declined the offer.

secured and unsecured—totaled some $3 million. Many were acknowledged with promissory notes issued by one of the three companies.

Between 1967 and 1971, the brothers discussed repayment of the loans several times. They agreed that the taxpayer would be repaid when money was available over and above the demands of more immediately pressing (i.e., secured) creditors. Also, in May 1970, Mann pledged various corporate stocks (including shares of Murmanill) to the taxpayer in an effort to provide some security for the unsecured loans. By the end of 1971, these stocks had no value.

The credit drought weakened Diversa beyond recovery. By early 1971, the once robust organization was an emaciated hulk, parched of all its active businesses but a small office-cleaning outfit. In March 1971, Diversa was adjudged a bankrupt, reporting assets of $5.5 million and debts and claims against it amounting to $19.8 million.[5] Mann nevertheless remained optimistic and retained Phillip Palmer, a Dallas bankruptcy lawyer. Palmer, in no mean feat, managed to convert the proceeding into a Chapter XI reorganization with Diversa as debtor-in-possession. But, by December 31, 1971, even the cleaning company was in default.

### No Bucks

Still, Mann worked to resurrect his company. A plan of arrangement was proposed in early 1972 and ratified by Diversa's unsecured creditors. Under the plan, those creditors would receive common stock in a rehabilitated Diversa in repayment for their debts. Mann contacted two English investors, who were to infuse a massive amount of capital into the defunct organization. When the re-funding scheme fell through, the plan was abandoned. Mann then proposed setting up a whole new organization—American Industries International. Again, the company was to be supported by a huge amount ($150 million) of foreign capital. Unsecured creditors and Diversa shareholders would have been equity holders in the new venture. The foreign money never materialized, and the scheme was dropped. In late 1972 and early 1973, the bankruptcy court ordered a return to straight bankruptcy proceedings, appointed a trustee, and liquidation of Diversa's few remaining assets commenced.

In September 1973, the taxpayer was allowed to recover $230,000 from the bankruptcy court in a compromise settlement on certain secured loans he had made to the holding organization. The taxpayer died in November 1973. Ultimately, as a result of the continuing bankruptcy proceedings, the taxpayer's estate received a distribution of less than $21,000 on his unsecured claims against Diversa in 1976.[6]

The taxpayer's estate filed a claim with the Internal Revenue Service in 1978 for a refund of about $1.5 million in taxes he paid in 1968 and 1969. The estate asserted that those taxes would be offset by a deduction for the business loans he collectively made to Diversa which became wholly worthless in 1971.[7] The Government dis-

---

**5.** The petition for bankruptcy was brought by creditors of the Apparel Corporation—a company Diversa had sold several years before but for whose debts it was still responsible. Diversa grew and died because of its subsidiaries.

**6.** The estate also received a distribution of less than $38,000 in 1979, after it had filed for the bad debt deduction. As will be clear from part III, *infra*, this sum is not material to this appeal.

**7.** I.R.C. (26 U.S.C.) § 166(a), grants a deduction from taxable income for a debt, other than a non-business debt as defined in § 166(d), that becomes wholly worthless within the taxable year. Section 166(d)(2) defines a non-business debt as a debt other than

(A) A debt created or acquired (as the case may be) in connection with the trade or business of the taxpayer; or
(B) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

Unlike a non-business bad debt, which is treated as a short-term capital loss under § 166(d)(1), a business bad debt may be used to offset ordinary income in the year for which the deduction is allowed. Any portion of the deduction not used to offset income in that year may be "carried back" to earlier years as a net operating loss pursuant to I.R.C. § 172. Section 172(d)(4) provides that any excess of non-business deductions over non-business income shall

puted the claim, and the estate filed suit for the refund in federal court.

At trial, the Government's motions for a directed verdict both at the close of the estate's evidence and at the close of all the evidence were denied. The jury found that the taxpayer had made loans to Mann, Mann Jr., and the three companies totalling about $3 million, that the loans created business debts, and that the debts became wholly worthless in 1971. The Government's motions for j.n.o.v. or a new trial were denied. In August 1982, the Court entered judgment for the estate for a refund of about $935,000, plus interest from January 1, 1972. After a separate bench trial, the Court found that the doctrine of equitable recoupment was not applicable to this case. *Mann v. United States*, 552 F.Supp. 1132 (N.D.Tex.1982). The Government timely appealed.

## II. The Debts—A Business Basis?

The Government first contends that there was insufficient evidence presented at trial for the jury to find that the taxpayer's dominant motivation in making the loans was his "trade or business" as a broker. It emphasizes that the taxpayer's loans benefitted the company on which his brother and nephew were financially dependent and were thus for personal, not business, reasons. Moreover, it says, the taxpayer himself had a substantial personal ownership interest in Diversa to protect, and protecting one's investment is a decidedly non-business motivation. Finally, the "risk" of the loans does not compare with any "potential reward" from this business.

All considered, the Government concludes, the District Court erred in denying its motions for directed verdict and j.n.o.v.

■■■■ As the Government well knows, this Court is not the first body to view the evidence. Here, the jury was the factfinder, and it has already made a determination of the facts.[8] We look only to whether reasonable men and women could have arrived at a verdict other than for the Government. Of course, we consider all the evidence at trial, but in the light and with all reasonable inferences most favorable to the estate. If we find evidence of such a quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment could have reached different conclusions, the verdict stands. *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc). Our narrow task is to guard against errors of law and patently incorrect determinations of fact.

■■■ A reading of the record by those illuminating principles shows that the Government cannot prevail on this issue.

Of course the loans were made between brothers. This is important—not dispositive. We must consider all the facts unique to this case in determining whether the taxpayer's loans created business or non-business debts. *Hogue v. Commissioner*, 459 F.2d 932, 937 (10th Cir.1972); *Young v. Commissioner*, 33 T.C.M. 397, 402 (1974).

The testimony at trial shows that the taxpayer and Mann conducted their business transactions as businessmen.[9] Mann

not be carried back as a net operating loss deduction. As a consequence, unless the taxpayer's loans are characterized as creating business debts, they may not be carried back to generate a refund for the taxes he paid in 1968 and 1969.
 Under I.R.C. § 6511(d), bad debt deductions under § 166 are subject to a 7-year period of limitations, unlike the usual 3-year period for filing a claim for tax credit or refund.

8. Whether an asserted bad debt is a business or non-business debt (it cannot be both) is a question of fact. *See* Treas.Reg. (26 C.F.R.) § 1.166–5; *Adelson v. United States*, 1 Cl.Ct. 61, 553

F.Supp. 1082, 1083 (1982); *Dallmeyer v. Commissioner*, 14 T.C. 1282, 1289 (1950). The taxpayer has the burden of proving that he sustained bad debt losses which were proximately related to his trade or business. *Spillers v. Commissioner*, 407 F.2d 530, 534 (5th Cir.1969); *Kelly v. Patterson*, 331 F.2d 753, 755 (5th Cir. 1964).

9. Initially, we reject the Government's characterization of the witnesses at trial as interested. There is no evidence in the record that any material witness had any financial stake in this litigation.

himself described how they bargained over the taxpayer's commission fees:

Q. Were there occasions when you negotiated the amounts of [brokerage] fees with your brother, Guy Mann, or [his associate] Len Acton?

A. Yes.

Q. Was it [the] kind of negotiations you would have conducted with any person, any broker?

A. Sure. Arms length. We were trying to save money.

This business relationship is further borne out by Mann's testimony about their negotiations over a particular commission (related to two large bank loans for Diversa) on which Mann succeeded in obtaining more favorable payment terms for Diversa.

Moreover, Dale Carpenter (the former Secretary of Diversa) testified that the taxpayer's loans were treated like any other corporate indebtedness, and were included in SEC disclosure reports. As both Carpenter and Douglas Russell (the former Treasurer of Diversa) testified, notes or security agreements were prepared for the loans.[10] As summed up by Russell, "when [the loan] transactions occurred, ... there was no indication ... that they were a gift."

■ In arguing that the taxpayer was merely protecting an investment, the Government emphasizes that the taxpayer apparently had over 150,000 shares of Diversa stock at the time of his death in 1973, an ownership interest which it characterizes as substantial. Of course, investing does not constitute a "trade or business" for purposes of a bad business debt deduction. *Whipple v. Commissioner,* 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963); *Miles Production Co. v. Commissioner,* 457 F.2d 1150 (5th Cir.1972). Thus, if the

taxpayer was seeking to protect or enhance his ownership interest in Mann's organization, the loans would have created non-business debts.

■ However, the Government focuses on the wrong time period. The taxpayer made the loans between 1967 and 1970. At that time, he had no substantial investment in the organization to preserve. As Carpenter and Mann Jr. testified, he then had either no shares or an insignificant number of shares in Murmanill and Inwood Securities. As Carpenter further related, the taxpayer also had only about 4,000 or 5,000 shares in Diversa, out of several million shares then outstanding. The jury was perfectly free to believe that testimony. From it, the jury could conclude that the taxpayer was not motivated to make the loans by his investment interest in the organization.

■ Finally, we disagree that under *United States v. Generes,* 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), the numbers do not add up. In that case, the taxpayer (Generes) owned 44% of a construction business, for which he also served as president. To help the company through certain financial difficulties, Generes directly and indirectly loaned it over $300,000. Ultimately, the company went into receivership, and Generes was not reimbursed. He claimed a bad business debt deduction, asserting that he made the loans to protect his job and $12,000 annual salary—a legitimate business reason. *See, e.g., Trent v. Commissioner,* 291 F.2d 669 (2d Cir.1961).

The Supreme Court held that, in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business,[11] "the proper measure is that of dominant motivation." 405 U.S. at 103, 92

---

10. We recognize that many of the taxpayer's loans were unsecured by property of the companies. On the other hand, some were secured. These facts are of some probative value, but certainly not controlling, as to whether the loans created business or non-business debts.

11. Treas.Reg. § 1.166–5(b)(2) provides in relevant part:

[T]he character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt [is a business debt].

S.Ct. at 833. It reversed the jury verdict for Generes because it was based on an erroneous instruction of the law.

Rather than remand for a new trial, the Court rendered j.n.o.v. for the Government. It discounted the taxpayer's testimony as "obviously ... self-serving," and found that no reasonable jury could conclude that Generes' dominant motivation in making the loans was to protect his salary as president. Under the dominant-motivation standard, the Court said, a trier of fact could "compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." *Id.* at 104, 92 S.Ct. at 833. Comparing Generes' $7,000 (after tax) salary to the over $300,000 in loans left no room for reasonable minds to differ. This was especially obvious considering that he owned 44% of the company and had a substantial investment in it, and that his son and two sons-in-law were in varying degrees dependent on the firm. *Id.* at 106, 92 S.Ct. at 834.

There is much more evidence here to support a dominant business motivation than in *Generes.* Certainly, the taxpayer's family interest in the survival of his brother's company was strong. However, his personal ownership interest in the holding organization was nowhere near Generes' in the construction company. On the contrary, there was credible evidence at trial that his was practically negligible. More important, the taxpayer's potential gain from the continued existence of Mann's organization was infinitively more than the relatively meager salary Generes could have expected. There was testimony that, in the twenty-odd years before he made the loans, the taxpayer had shared with his associate some $430,000 in cash brokerage commissions from transactions involving Murmanill or Diversa. His profit from non-cash brokerage commissions was even more substantial. In the University Computing deal alone, the taxpayer earned a stock commission ultimately worth over $11 million.[12]

In short, the evidence considered as a whole created a proper and disputed question of fact. The jury, as the factfinder, decided the question in a reasonable manner. We can and would not overturn that decision.

## III. Worthlessness—Then or By-and-By?

The Government next challenges the jury's finding that the taxpayer's loans became worthless in 1971.

To deduct a bad debt, the debt must have become "worthless within the taxable year." I.R.C. § 166(a)(1). Worthlessness in a particular year is a question of fact, which the taxpayer has the burden of proving by a preponderance of the evidence. *Eagle v. Commissioner,* 242 F.2d 635, 637 (5th Cir.1957); *Lunsford v. Commissioner,* 212 F.2d 878, 883 (5th Cir.1954); *Commissioner v. First State Bank of Stratford,* 168 F.2d 1004, 1009 (5th Cir.), *cert. denied,* 335 U.S. 867, 69 S.Ct. 137, 93 L.Ed. 412 (1948). All of the pertinent evidence including the value of the collateral, if any, securing the debt and the financial condition of the debtor are to be considered. Treas.Reg. § 1.166–2(a); *Riss v. Commissioner,* 478 F.2d 1160, 1166 (8th Cir.1973); *Dallmeyer v. Commissioner,* 14 T.C. 1282, 1291 (1950).

A taxpayer must prove that on January 1 of the taxable year the debts had some intrinsic or potential value, and that by December 31 the debts had lost all such value. *Hubble v. Commissioner,* 42 T.C.M. 1537, 1544 (1981). But a taxpayer

---

**12.** That expedited deal was obviously facilitated, if not made possible, by the unique risk-taking nature of Diversa and its established business relationship with the taxpayer. Thus, it is no argument that Diversa itself did not pay the taxpayer's commission.

Further, we do not find convincing the Government's argument that the $5 million which the taxpayer eventually realized from the stock cannot be considered part of his brokerage commission, because when he received it the stock of the fledgling company was apparently worth little. Obviously, a broker accepts (perhaps even invites) the risk that the value of the stock commission will vary with the success of the company, when he accepts the stock as a fee. Fortunately for the taxpayer, University Computing flourished.

need not be "an incorrigible optimist." *United States v. S.S. White Dental Manufacturing Co.*, 274 U.S. 398, 403, 47 S.Ct. 598, 600, 71 L.Ed. 1120 (1927). Debts are wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future, *Dallmeyer v. Commissioner*, 14 T.C. 1282, 1292 (1950), and it could thus be concluded that they have lost their "last vestige of value." *Bodzy v. Commissioner*, 321 F.2d 331, 335 (5th Cir.1963). This will usually entail proof of the existence of identifiable events which demonstrate the valuelessness of the debts. *Riss v. Commissioner*, 478 F.2d 1160 (8th Cir.1973); *Crown v. Commissioner*, 77 T.C. 582, 598 (1981); *Hubble v. Commissioner*, 42 T.C.M. 1537, 1544 (1981).

 So, in this essentially factual determination, if the evidence introduced at trial is sufficient under *Boeing Co. v. Shipman*, and the jury was properly instructed in the law, their finding that the debts became wholly worthless in 1971 will stand.

The record reveals ample evidence to support that finding. It is not disputed that Diversa was still operating as 1971 began. However, the evidence was overwhelming that the organization was on the brink of complete collapse. Then, of course, it was involuntarily forced into bankruptcy in March 1971. This would clearly indicate the worthlessness of at least a part of the taxpayer's unsecured and unpreferred debts. Treas.Reg. § 1.166–2(c)(1). However, the institution of bankruptcy proceedings is not alone dispositive of whether debts become wholly worthless at that time. *Patten & Davies Lumber Co. v. Commissioner*, 45 F.2d 556, 558 (9th Cir.1930); *Dallmeyer v. Commissioner*, 14 T.C. 1282, 1292–93 (1950); *Hubble v. Commissioner*, 42 T.C.M. 1537, 1545 (1981).

 There is other evidence of the worthlessness of the debts at that point. Both Mann Jr. and Palmer (Mann's bankruptcy counsel) testified that in March 1971

there was no reasonable probability that unsecured claims would be satisfied.[13] James A. Baker, a Dallas bankruptcy lawyer, also testified about the value of unsecured claims against Diversa. Baker represented Len Acton, the taxpayer's brokering associate and a Diversa unsecured creditor, and attended the March 1971 proceedings to assess his client's chances of being repaid. He concluded

> that an unsecured creditor of Diversa would probably have an uncollectible claim. In my opinion it means that there would be no money paid to a person who was an unsecured creditor of Diversa at that particular time.

Finally, it is undisputed that by December 31, 1971 even Diversa's office-cleaning business was in default.

On all this evidence, the jury could properly have found that the taxpayer, in the exercise of "sound business judgment" based upon as complete information as was reasonably obtainable, could have determined that the debt in fact had become worthless in 1971. *Minneapolis, St. Paul Railroad Co. v. United States*, 164 Ct.Cl. 226, 241 (1964); *accord Sollitt Construction Co. v. United States*, 1 Cl.Ct. 333 (1983); *Levin v. United States*, 220 Ct.Cl. 197, 597 F.2d 760, 767 (1979).

 The Government does not seek to counter this evidence. Neither does it seriously challenge the conclusion that in 1971 the taxpayer might reasonably have given up hope for any recovery of his loans to Diversa. Rather, the Government contends that the $21,000 payment in 1976 which resulted from the on-going bankruptcy proceedings precludes the estate from claiming in 1978 that the loans were wholly worthless in 1971. We disagree.

It is axiomatic that tax law treats each taxable year as a separate unit. Thus, a taxpayer must determine and file a return of his income and loss on an annual basis, without benefit of hindsight. This same principle has been true in determining the worthlessness of a bad debt for a particular taxable year:

**13.** At that time, secured claims against Diversa and its unpaid state and federal taxes totaled

over $9.7 million, about $4.2 million more than its then-estimated assets.

Subsequent events may only be used to evaluate the soundness of the belief that a debt became worthless in a certain year, and not as evidence of the fact of worthlessness.... The fact that a debt reasonably determined to be worthless in a given taxable year, is subsequently recovered in part or in full, is not in itself sufficient to prevent the deduction.

5 J. Mertens, *Law of Federal Income Taxation* § 30.37 (1980); *see also id.* at § 30.-81.

Thus, subsequent recoveries have not precluded otherwise valid deductions. *See United States v. S.S. White Dental Manufacturing Co.*, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927) ($130,000 investment worthless in 1918 even though $6,000 recovered in 1922); *Textron, Inc. v. United States*, 561 F.2d 1023 (1st Cir.1977) ($6 million loan and capital investment worthless in 1959 despite complete recovery in 1963); *Patten & Davies Lumber Co. v. Commissioner*, 45 F.2d 556 (9th Cir.1930) ($15,000 loan worthless in 1921 although $13,000 recovered in 1922); *Woods Lumber Co. v. Commissioner*, 44 B.T.A. 88 (1941) ($1,100 bad debt deduction allowed in 1935 although $150 recovered shortly after 1935); *Richards & Hirschfeld, Inc. v. Commissioner*, 24 B.T.A. 1289 (1931) ($2300 debt worthless in 1920 even though small payments from liquidation proceedings after 1920).[14]

**14.** *See also Young v. Commissioner*, 123 F.2d 597 (2d Cir.1941) (possibility for repayment in 1936 of ⅝ of 1% of investment does not alter worthlessness of stock as of 1932); *New York Water Service Corp. v. Commissioner*, 12 T.C. 780, 788 (1949) (facts subsequent to taxable year "may be used only to evaluate the soundness of [the taxpayer's] decision that the debt was worthless in [that year] and not as evidence of the fact of worthlessness"); *Hubble v. Commissioner*, 42 T.C.M. 1537, 1546 (1981) (accord); *Sollitt Construction Co. v. United States*, 1 Cl.Ct. 333 (1983) (accord). *Compare Bodzy v. Commissioner*, 321 F.2d 331 (5th Cir.1963) (where evidence of some assets·remaining in company in year of alleged worthlessness, and three repayments in following two years, debts not then worthless); *Crown v. Commissioner*, 77 T.C. 582 (1981) (accord); *Sitterding v. Commissioner*, 20 T.C. 130 (1953) (accord).

The Government argues, however, that in the cases cited above the taxpayer filed for the deduction before receiving the repayments. It asserts that the inquiry as to the worth of the debt must be determined as of the time the bad debt deduction is filed, and cites as controlling authority *Brimberry v. Commissioner*, 588 F.2d 975 (5th Cir.1979).

This argument misinterprets *Brimberry*. There, the taxpayer had made a loan of $175,000 to a New Orleans church in 1967, hoping to secure a construction contract from the church. Then, in 1967 and 1968, Brimberry claimed deductions of partially worthless business debts under § 166(a)(2) totaling about $170,000. He based his claim on three factors. Over the two years, the SEC had filed a complaint ·against the church (concerning the sale of church bonds), the church had instituted Chapter X reorganization proceedings, and the church's liabilities had exceeded its assets. Both the Commissioner and Tax Court disallowed the claims in their entirety.

We affirmed, finding that none of the three factors justified a belief in 1968 (and *a fortiori* in 1967) that Brimberry's loans had become worthless in that year. 588 F.2d at 978. Significantly, we looked *only* to the circumstances of the taxable years in question.[15]

We rejected the taxpayer's suggestion that events in subsequent years substanti-

**15.** As to the first factor, we found that

the institution of the SEC action [in 1967] need not necessarily be accorded any independent significance. The church was placed in receivership pursuant to the SEC proceeding in order to marshal and preserve its assets, and there was no sound basis *in 1967* for concluding that the receivership would fail of its purpose.

588 F.2d at 978 (emphasis added).

As to the significance of the Chapter X reorganization proceeding in 1968, we observed that the church had not been declared bankrupt, and that Brimberry's loan was at least partially secured. The reorganization petition filed by the church asserted that the proceeding would insure the payment of all claims in part, if not in full. In granting the petition *in 1968*, the District Court indicated that it

ated his claim that the debt was partially worthless in 1967 and 1968, remarking that "hindsight is always 20/20." *Id.* at 979. For purposes of review, we said, "the facts must be considered as they existed at the time the deduction was taken." *Id.*

The Government reads too much into the phrase "at the time the deduction was taken." It seems plain that a deduction is "taken" in the year for which the expense may be charged off.[16] Thus, a bad debt deduction is "taken" in the year the debt is alleged to have become worthless. Under I.R.C. § 166(a)(1) and Treas.Reg. § 1.166-3(b), that is the only year in which the debt can be deducted. Nothing in *Brimberry* suggests that the time at which the deduction is "taken" is any time other than the end of the taxable year in question. The clear holding of *Brimberry* is not, as the Government asserts, that hindsight may be used up to the date that the deduction is filed for. Rather, it holds that hindsight, although "always 20/20," simply does not enter into the determination of worthlessness, at least insofar as proof of the fact of worthlessness.

This view comports with both the tax regulations and precedent, and it just

makes better sense. Treas.Reg. § 1.166-(1)(f)[17] clearly recognizes that a debt may be deducted as wholly worthless even though some value may ultimately be recovered on it. The recovery is included as income for the later year; it does not invalidate the previous bad debt deduction. Moreover, as we have already said, courts have long allowed bad debt deductions where repayments were received while the claim was still pending. We find no reason, and the Government points out none, for allowing the use of hindsight in pre-filing repayment cases which would not apply with equal force to cases where the repayment is received after the deduction is filed for. The proffered distinction is unmerited.[18]

In sum, we hold that events subsequent to a given taxable year—events which may include repayment before the bad debt deduction claim is filed—neither prove nor disprove whether the business debt was worthless in that year. If and when such a debt becomes wholly worthless must be determined from the facts and circumstances known or which reasonably could have been known at the end of the year of asserted worthlessness.[19]

reasonably expected that a plan of reorganization could be effected and that the corporation could be preserved as a going concern. The pendency of reorganization proceedings *in 1968* did not necessarily justify Brimberry's conclusion that his loan had become virtually worthless in that year. *Id.* (emphasis added).

Finally, we pointed out that Brimberry had over-estimated the insolvency of the church in 1968 by basing his financial analysis on liquidation values rather than on "going concern" principles. Consequently, "*In 1968* there was no sound reason for concluding that the church would be forced to liquidate its assets." *Id.* (emphasis added).

Thus, the Court looked only to the facts as of 1967 and 1968, the years in which the debts assertedly became partially worthless.

16. The taxpayer's bad debt deduction was not "taken" in 1978 when the estate filed the amended return any more than the deduction would have been "taken" in 1972 if the deduction had been included in an original 1971 income tax return filed on April 15, 1972.

17. *Recovery of bad debts.* Any amount attributable to the recovery during the taxable year of a bad debt, or of a part of a bad debt, which was allowed as a deduction from gross income in a prior taxable year shall be included in gross income for the taxable year of recovery . . . .

18. The Government hints that the estate comes to court with unclean hands. There is no question but that the deduction was filed for within the statutory limitations period. Beyond that, we find it no more improper to claim for a bad business debt deduction with knowledge of a repayment than to continue to pursue an already-filed deduction claim with the same knowledge (which, as we have said, has long been allowed). Under the tax laws, worthlessness is viewed as a snapshot, not as an endlessly updated film.

19. Of course, proof of subsequent events may be allowed, as they were here, insofar as they may be relevant to the reasonableness of a conclusion that a debt became worthless in the particular year in issue.

▮ Thus, that a small repayment was made on the taxpayer's $3 million in loans before the deduction was claimed does not, as a matter of law, preclude the jury's finding of total worthlessness in 1971. Since there was sufficient evidence to support that finding, and since the District Court gave proper instructions on the law,[20] we affirm the verdict.

## IV. Equitable Recoupment—By Bull or Barred?

▮ The Government's final contention is that the District Court erroneously applied the doctrine of equitable recoupment, as articulated in *Stone v. White*, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265 (1937), and *Bull v. United States*, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). The estate failed to include its refund claim as an asset of the estate, and thus the resulting federal estate taxes were underpaid. Under principles of equitable recoupment, the Government reasons, this underpayment may be recovered out of the income taxes refunded in the proceedings today, even though the limitations period for reviewing the estate taxes has run. The District Court rejected that argument, in an opinion reported at 552 F.Supp. 1132.

After examining the not completely consistent lower court precedent on this doctrine, we conclude that the fine opinion of the Court below is a correct statement of the law. It gave proper weight to the Supreme Court's most recent explanation of recoupment in tax litigation—*Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 67 S.Ct. 271, 91 L.Ed. 296 (1946). There, the High Court emphasized "the limited scope," *id.* at 299, 67 S.Ct. at 272, of

the doctrine it had applied only in *Stone* and *Bull*, *id.* at 300, 67 S.Ct. at 273.

> In both [cases], a single transaction constituted the taxable event claimed upon and the one considered in recoupment. In both, the single transaction or taxable event had been subjected to two taxes on inconsistent legal theories, and what was mistakenly paid was recouped against what was correctly due.

*Id.* at 299–300, 67 S.Ct. at 272.

Here, the District Court correctly held that the deduction in 1971 of bad business debts for income tax purposes and the failure in 1973 to include the refund claim as an asset of the estate for estate tax purposes is not "a single transaction" or "taxable event." 552 F.Supp. at 1140–41. We need not restate its clear reasoning.

## V. Conclusion

To sum up this case of brothers, businesses, bankruptcy, and too few bucks, the jury could properly have concluded that the taxpayer's loans created business debts and that the debts became wholly worthless in 1971. Moreover, the District Court properly rejected the Government's claim for equitable recoupment.

AFFIRMED.

---

**20.** The Government does challenge the District Court's instructions. It asserts that the charge led the jury to believe that the taxpayer had claimed the bad debt deduction in 1971, when in fact the estate had filed the claim in 1978. This, it says, deprived the Government of the probative value of the fact that the taxpayer, an experienced businessman and lawyer, did not himself file the claim.

Read as a whole, we find the charge succinct, understandable, and legally correct. When the evidence introduced at trial and the arguments of counsel are considered, as they must be, *Smith v. Borg-Warner Corp.*, 626 F.2d 384 (5th Cir.1980); *Coughlin v. Capitol Cement Co.*, 571 F.2d 290 (5th Cir.1978), the challenged portion is plainly not misleading.