FILED
United States Court of Appeals
Tenth Circuit

August 5, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN S. RENDALL; CHRISTOBEL
D. RENDALL,

            Petitioners - Appellants,

    v.

COMMISSIONER OF INTERNAL
REVENUE,

            Respondent - Appellee.

No. 06-9007

---

**APPEAL FROM THE UNITED STATES TAX COURT**
**(T.C. No. 16337-04)**

---

Charles E. Anderson, Santa Fe, New Mexico, appearing for Appellants.

Ellen Page Delsole, Attorney, Tax Division (Nathan J. Hochman, Assistant
Attorney General, and Teresa E. McLaughlin, Attorney, Tax Division, with her on
the brief), Department of Justice, Washington, D.C., appearing for Appellee.

---

Before **TACHA**, **BRISCOE**, and **HARTZ**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

    John S. Rendall and his wife, Christobel D. Rendall, appeal from a decision

of the United States Tax Court assessing a $259,874 deficiency in the Rendalls'

income tax for the taxable year 1997. The decision was based on the Tax Court's

determination that gains from the sale of stock pledged as collateral for a loan are taxable to the Rendalls and must be calculated under the first-in/first-out ("FIFO") method, *see* 26 C.F.R. § 1.1012-1(c), and that the Rendalls are not entitled to a $2 million worthless-debt deduction, *see* 26 U.S.C. § 166(a). We have jurisdiction under 26 U.S.C. § 7482(a)(1) and AFFIRM.

## I. BACKGROUND

The parties have stipulated to the following facts.

A.    Solv-Ex's Formation and Operations Through March 1997

Mr. Rendall was one of two founding shareholders of Solv-Ex Corporation and was the chief executive officer and chairman of the board from its inception until his resignation in November 2000. Mr. Rendall purchased 2,700,000 shares of Solv-Ex common stock for $.01 per share at the corporation's initial public offering in July 1980. Between 1981 and 1996, Mr. Rendall purchased 677,860 additional shares at prices ranging from $.01 to $19 per share. During 1996 and early 1997, Solv-Ex's stock traded at prices ranging from $6.25 to $38 per share.

Solv-Ex's business activity consisted of researching and developing a process to extract bitumen from oil sands and convert it to synthetic crude oil. Solv-Ex claimed to have developed a cost-effective method for extracting and processing oil and industrial minerals from oil sands. It also claimed to have developed a patented process to recover raw aluminum and other marketable mineral products from the fine clays contained in oil sands or in the waste tailings

that remain after the oil sands are processed.

During 1995, Solv-Ex acquired a 90% interest in oil-shale leases in Alberta, Canada. It then sought to raise the estimated $125 million required to construct an oil extraction and upgrading plant in Alberta. After funding promised in a handshake deal fell through, Solv-Ex proceeded to build only an initial-stage plant in Alberta with plans to build the remaining facilities when financing could be obtained. Construction of the initial-stage plant was completed in March 1997, and Solv-Ex demonstrated the viability of its oil extraction process through test operations. At that time, however, the plant was not yet able to run continuously.

B.     1997 Efforts to Complete the Initial-Stage Plant

In 1997, Mr. Rendall sought alternative funds to complete the Alberta plant. In March 1997, he loaned $2 million to Solv-Ex from funds obtained through a margin account with Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"). Mr. Rendall already had outstanding debts to Merrill Lynch, and the loan to Solv-Ex increased his total indebtedness to Merrill Lynch to $4 million. Solv-Ex used the $2 million received from Mr. Rendall and $10 million from outside lenders to continue work on the Alberta plant.

C.     Mr. Rendall's Pledge of Solv-Ex Common Stock to Merrill Lynch

To obtain the line of credit through his Merrill Lynch margin account, Mr. Rendall pledged 2,660,000 shares of his Solv-Ex common stock as security. Pursuant to the pledge agreement, Mr. Rendall delivered the stock certificates for

the pledged shares to Merrill Lynch.  As described by the certificates, 2,500,000 of the pledged shares were the shares that Mr. Rendall purchased for $.01 per share at the initial public offering, and the remaining 160,000 shares consisted of stock purchased at various times after 1980.

D.      Merrill Lynch's Sale of the Pledged Stock

The pledge agreement between Mr. Rendall and Merrill Lynch specified that the loans were payable on demand.  On May 2, 1997, Merrill Lynch demanded repayment of the total loan balance of $4,195,022 plus interest by May 9, 1997.  Merrill Lynch informed Mr. Rendall that if payment was not received by that date, it would liquidate the pledged shares of Solv-Ex stock to pay the debt. Mr. Rendall did not repay the loan.  Instead, the parties exchanged correspondence disputing Merrill Lynch's right to sell the pledged shares.  Merrill Lynch then sent a letter to Solv-Ex and its transfer agent requesting that the transfer agent register 1,100,000 shares of the pledged stock in Merrill Lynch's name.  Solv-Ex opposed the action, but the transfer agent proceeded with the transfer nonetheless.  Thereafter, Merrill Lynch sold 634,100 shares of Mr. Rendall's Solv-Ex common stock at prices ranging from $6 to $7.625 per share. The total proceeds from the sales of these shares were $4,229,479.  In June 1998, Merrill Lynch returned to Mr. Rendall a single stock certificate representing his remaining pledged shares.

E.      Failure to Complete the Initial-Stage Plant

Solv-Ex continued its efforts to put the Alberta plant into operation during April 1997, but after the Merrill Lynch loan was called, the corporation had difficulty obtaining the necessary financing. Consequently, it began to "mothball" the plant in May 1997. Toward the end of June 1997, Mr. Rendall continued his attempts to obtain financing for the completion of the Alberta plant by offering to sell a portion of Solv-Ex to a large oil company. These attempts proved unsuccessful, however, when the prospective buyer learned that Solv-Ex would be filing for bankruptcy protection under Canadian law.

F.      Solv-Ex's Bankruptcy Reorganizations

Solv-Ex filed for reorganization bankruptcy in Canada on July 14, 1997, and on August 1, 1997, it filed for Chapter 11 bankruptcy in the United States. The two bankruptcy proceedings were jointly administered under a cross-border insolvency protocol agreement.

During the bankruptcies, Solv-Ex sold its interest in the leases and its oil production facilities and equipment in Alberta to two separate buyers: (1) a 78% interest to Koch Exploration Canada, Ltd. ("Koch"), in exchange for $30 million in Canadian dollars, with Koch also receiving warrants to purchase 2 million shares of Solv-Ex common stock at a discount; and (2) its remaining 12% interest to United Tri-Star Resources, Ltd. ("UTS") for $3 million and 5 million shares of UTS common stock. Solv-Ex entered into a bankruptcy-court-approved agreement with Koch on November 14, 1997, and both sales closed in March

1998.

As part of the agreement with Koch, Solv-Ex retained ownership of its technologies for hydrocarbon extraction and for mineral and metal extraction, as well as the rights to develop the oil-sands leases for the recovery of such minerals and metals. Solv-Ex also retained numerous process patents in the United States, Canada, and other countries covering its bitumen and mineral extraction technologies. In addition, Solv-Ex retained other assets, including 1.5 acres of land in Albuquerque, New Mexico, upon which a research facility, office space, a pilot plant, machinery, and equipment were situated. It also continued to employ a team of research assistants for a possible fresh start.

In Solv-Ex's business plan, filed in June 1998 as part of an amended disclosure statement, Solv-Ex set forth its intention to focus on: (1) commercializing its TiO2S technology, Solv-Ex's trade name (for which it had applied for a trademark) for a substitute filler and pigment for titanium dioxide useful in the paper, paint, and plastics industries; (2) supporting the licensing of Solv-Ex's technology for bitumen extraction; and (3) "obtaining a joint venture partner for a project that will establish a major alumina and aluminum reduction production facility in Alberta, Canada, or at another site yet to be determined." The business plan was developed with a goal of bringing a reorganized Solv-Ex to the point of positive cash flow by the year 2000.

G.    Solv-Ex's Financial Statements

The record does not contain any financial statements reflecting Solv-Ex's financial position as of December 31, 1997. A set of unaudited financial statements is attached as an exhibit to the amended disclosure statement. Those statements include a balance sheet for Solv-Ex and its subsidiaries as of March 31, 1997, which shows total assets of $105,451,134 and total liabilities of $58,378,781.

H.    Trading in Solv-Ex Common Stock

Before the joint bankruptcies, the principal market in which Solv-Ex's common stock was traded was the NASDAQ SmallCap Market. During the first quarter of 1997, Solv-Ex common stock traded between a high of $21.50 and a low of $10 per share. During the succeeding quarter, ending June 30, 1997, Solv-Ex common stock traded between a high of $14.125 and a low of $3 per share. Merrill Lynch sold the pledged stock during this quarter.

As a result of developments in the bankruptcy proceedings, NASDAQ delisted the Solv-Ex common stock on September 17, 1997. Thereafter, the stock traded over the counter. As of December 31, 1997, the stock was trading over the counter at approximately $3 per share.

I.    1997 Return and Amended Returns

In October 1998, the Rendalls filed a joint tax return for 1997. On the Schedule D, Capital Gains and Losses, the Rendalls used the last-in/first-out ("LIFO") method for determining the basis of the 634,100 shares of Solv-Ex

common stock pledged to and sold by Merrill Lynch in satisfaction of the $4 million loan. The Rendalls calculated the total basis of those shares as $1,305,714, with a resulting gain from the sale of $2,923,765 ($4,229,479 less $1,305,714). The return showed a tax due of $383,632, tax payments of $45,400, and an amount owed equal to the difference: $338,232.[1] This amount has not been paid.

Between 1999 and 2003, the Rendalls filed several amended returns. The first amended return differs from the original return by claiming a nonbusiness bad-debt deduction for the worthlessness of the $2 million loan to Solv-Ex. The second amended return claims a business, rather than a nonbusiness, bad-debt deduction for the worthlessness of the $2 million loan. On both of the amended returns, the Rendalls sought a tax refund for 1997 in the amount of $45,400.

On June 17, 2004, the Commissioner of Internal Revenue ("Commissioner") sent a notice of deficiency to the Rendalls. *See* 26 U.S.C. § 6212. The Commissioner calculated a deficiency of $259,874 in the Rendalls' income tax for the year 1997, which resulted in a total tax liability of $598,106 (the deficiency plus the $338,232 underpayment as reported on the Rendalls' original 1997 return). The Rendalls filed a timely petition in the Tax Court, challenging the Commissioner's determination of a deficiency and denial of their refund claims. *See id.* § 6213(a).

---

[1]This figure was mistakenly computed as $338,630 on the return.

After holding a bench trial, the Tax Court issued a decision on August 21, 2006, that upheld the Commissioner's determination. The Rendalls timely appeal, arguing: (1) proceeds from Merrill Lynch's sale of the Solv-Ex shares are not taxable to them; (2) if such proceeds are taxable to them, their basis in the stock should be computed using the LIFO (as opposed to the FIFO) method; and (3) they are entitled to a business bad-debt deduction or, in the alternative, a nonbusiness bad-debt deduction for the $2 million Mr. Rendall loaned to Solv-Ex.

## II. DISCUSSION

A.      Burden of Proof

Generally, the taxpayer bears the burden of proof on all issues presented in a case. *See* 26 U.S.C. § 7453; Tax Court Rule 142(a)(1). If, however, the "taxpayer introduces credible evidence with respect to any factual issue," *see* 26 U.S.C. § 7491(a)(1), and also meets substantiation and record maintenance requirements, *see id.* § 7491(a)(2)(A)–(B), the burden shifts to the Commissioner with respect to that issue. "Credible evidence," as used in § 7491(a)(1), means "the quality of evidence, which after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted." *Blodgett v. Comm'r*, 394 F.3d 1030, 1035 (8th Cir. 2005) (emphasis and quotation omitted).

The Rendalls argue that they presented credible evidence as to each issue, and therefore, the Tax Court should have shifted the burden of proof to the

Commissioner. We disagree. It follows, then, that the Rendalls bear the burden with respect to the calculations of their gain, if any, on Merrill Lynch's sale of pledged stock and their entitlement to a bad-debt deduction—a burden that, because of the absence of credible evidence on these issues, the Rendalls cannot sustain. *See Bernardo v. Comm'r*, 81 T.C.M. (CCH) 191, 2004 WL 1926094, at *11 n.6 (2004). Therefore, the following discussion may be viewed as setting forth the basis for our determination that the Rendalls have failed to (1) introduce "credible evidence" and (2) carry their burden of proof. *See id.*

B.     Taxability on Sale of Solv-Ex Shares

The Tax Court concluded that, as the owner of the shares pledged to Merrill Lynch, Mr. Rendall was taxable on any gains resulting from their sale. *See Old Colony Trust Assocs. v. Hassett*, 150 F.2d 179, 182 (1st Cir. 1945) ("A pledgee who has not foreclosed has only a special interest or property in the stock during the continuance of the pledge. The pledgor retains the title and gains from sales of the collateral are taxed to the pledgor."); *see also Nat'l Bank of Commerce of Dallas v. All Am. Assurance Co.*, 583 F.2d 1295, 1300 (5th Cir. 1978) ("The pledgee . . . has 'no general property right in the thing pledged, but only a right, upon default, to sell in satisfaction of the pledgor's obligation.'" (quoting *Pauly v. State Loan & Trust Co.*, 165 U.S. 606, 622 (1897))). On appeal, the Rendalls do not take issue with this statement of the law. Instead, they contend that the sale constituted an unlawful conversion of the stock and, accordingly, that Merrill

Lynch should be taxed on the gain resulting from such theft. In support of this argument, the Rendalls claim that Merrill Lynch needed Mr. Rendall's approval before it could sell the shares and was not authorized to have the shares reissued in its name in order to sell them.

Contrary to the Rendalls' contention, the terms of the pledge agreement clearly gave Merrill Lynch an unrestricted right to demand payment at any time. We agree with the Tax Court that there is no evidence in the record to indicate that the agreement was fraudulently induced or that Merrill Lynch sold the Solv-Ex shares for any reason other than to satisfy Mr. Rendall's debt. There is no dispute that Mr. Rendall refused to repay the loan upon demand, and Merrill Lynch subsequently sold only enough shares to satisfy his indebtedness. Additionally, we are not persuaded by—and the Rendalls offer no support for—the contention that it was unlawful for Merrill Lynch to ask the transfer agent to issue new certificates in Merrill Lynch's name. We agree that any action taken by Merrill Lynch was for the sole purpose of facilitating the sale of the collateral, which it unquestionably had the right to do under the pledge agreement. Accordingly, the Tax Court did not err in holding that the Rendalls are taxable on the gain realized when Merrill Lynch sold the Solv-Ex shares.

C.    Method of Basis Calculation

Gain from the sale of property is generally computed by taking the amount realized less the adjusted basis of the property. *See* 26 U.S.C. § 1001(a). The

basis is usually the cost. *See* 26 U.S.C. § 1012. The regulation that deals

specifically with the sale of stock generally states that, if shares of stock are sold

by a taxpayer who acquired the stock at different prices, and the particular shares

that were sold cannot be adequately identified, the FIFO method is used to

compute the basis; that is, the sold shares are charged against the earliest acquired

shares. *See* 26 C.F.R. § 1.1012-1(c); *Hall v. Comm'r*, 92 T.C. 1027, 1028 (1989).

If the stock can be adequately identified, however, the taxpayer may utilize the

LIFO method, meaning the sold shares are charged against the latest shares

purchased. *See* 26 C.F.R. § 1.1012-1(c); *Hall*, 92 T.C. at 1028. An "adequate

identification is made if it is shown that certificates representing shares of stock

from a lot which was purchased or acquired on a certain date or for a certain price

were delivered to the taxpayer's transferee." 26 C.F.R. § 1.1012-1(c)(2). If the

stock is left in the custody of a broker, an adequate identification can be made if

(1) at the time of the sale, the taxpayer specifies to the broker the particular stock

to be sold, and (2) within a reasonable time, confirmation of the specification is

set forth in a written document from the broker. *Id.* § 1.1012-1(c)(3)(i)(a)–(b).

The Rendalls concede that 2,500,000 of the 2,660,000 pledged shares in

Merrill Lynch's custody had a basis of $.01 per share. Therefore, at most, only

160,000 of the 634,100 shares sold are in dispute. The Rendalls argue that the

basis of these shares should be determined under the LIFO method. Mr. Rendall

did not, however, identify the stock to be sold at the time of the Merrill Lynch

-12-

sale, and the Rendalls do not offer any evidence identifying the particular certificates that comprised the 160,000 shares in dispute.

In an attempt to bypass § 1.1012-1(c), the Rendalls argue that the regulation is "obscure" and may be disregarded. They also contend that they identified the particular shares of stock on their tax return for 1997, which they filed in October 1998. They further claim that, had Mr. Rendall identified the shares to be sold prior to the sale, this action could be construed as consenting to the sale.

We are not persuaded by these arguments. Section 1.1012-1(c) governs here, and the Rendalls have not put forth any evidence that they complied with the provisions that would allow them to use the LIFO method: Mr. Rendall clearly had notice of Merrill Lynch's intention to sell the Solv-Ex shares, but he did not identify at the time of the sale the stock purchased at a higher price. Thus, we agree with the Tax Court that the basis for the stock must be calculated under the FIFO method.

D.    Worthless-Debt Deduction

Under 26 U.S.C. § 166(a), any debt may be deducted in the year in which it becomes worthless. In this case, the Tax Court noted that "the year of worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery." In determining that the Rendalls are not entitled to a bad-debt deduction in 1997 for the $2 million loan to Solv-

-13-

Ex, the court found that "the facts do not establish that all reasonable hope of any future satisfaction of the loan was lost in 1997."

The Rendalls first argue that this is an erroneous statement of the legal standard for worthlessness. We disagree. A debt becomes worthless during a taxable year if, based on the available information and surrounding circumstances of the debt, there is no reasonable hope for recovery. *See Cole v. Comm'r*, 871 F.2d 64, 67 (7th Cir. 1989) ("Proof of worthlessness generally requires a showing of identifiable events demonstrating the valuelessness of the debt and justifying abandonment of hope of recovery."); *Estate of Mann v. United States*, 731 F.2d 267, 276 (5th Cir. 1984) ("Debts are wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future"); *Flood v. Comm'r*, 81 T.C.M. (CCH) 1175, 2001 WL 170018, at *6 (2001) ("A debt becomes worthless in the tax year in which a creditor, using sound business judgment, abandons all reasonable hope of recovery on the basis of the available information regarding the surrounding circumstances of the debt."). Under this standard, a debt is only worthless if, as of the last day of the taxable year, a creditor may reasonably conclude that there is no possibility of future payment and that the debt also lacks any potential value due to the likelihood that it will remain uncollectible in the future. *See Estate of Mann*, 731 F.2d at 275–76; *Bauer v. Comm'r*, 75 T.C.M. (CCH) 219, 1998 WL 155535, at *3 (1998). This is precisely the legal standard employed by the Tax Court. Accordingly, the court did not err

-14-

in requiring the Rendalls to demonstrate that, as of December 31, 1997, there was no reasonable hope of recovery on the Solv-Ex loan.

Second, the Rendalls argue that they did, in fact, satisfy their burden to demonstrate worthlessness. The Rendalls emphasize that Solv-Ex had filed for bankruptcy and had an agreement to sell its interest in the leases and the oil production facilities and equipment in Alberta. They also note that Solv-Ex was insolvent, its technology was without value, and it had no prospective future earnings. While we recognize that Solv-Ex was experiencing financial difficulty and faced an uncertain future in 1997, many of the Rendalls' assertions are simply not supported by the record. As we explain below, we agree with the Tax Court that the Rendalls failed to show that, as of December 31, 1997, all reasonable hope for recovery on the Solv-Ex loan was lost.

To begin, although Solv-Ex had filed for bankruptcy in Canada and the United States in 1997, "the institution of bankruptcy proceedings is not alone dispositive of whether debts become wholly worthless at that time." *Estate of Mann*, 731 F.2d at 276; *see also Barrett v. Comm'r*, 71 T.C.M. (CCH) 2863, 1996 WL 196541, at *9 (1996) (stating that when a Chapter 11 reorganization bankruptcy continues without objection from creditors, there is a presumption that there is some hope for recovery) (citing *Mayer Tank Mfg. Co. v. Comm'r*, 126 F.2d 588, 592 (2d Cir. 1942)). Indeed, Solv-Ex's stock was still trading at $3 per share at the end of 1997, which is some evidence that the corporation was still

-15-

capable of paying at least some of its liabilities. *Cf. Estate of Mann*, 731 F.2d at 276 (upholding finding of worthlessness of an unsecured loan where testimony at trial established that no money would be paid on claims of an unsecured creditor).

Moreover, although Solv-Ex had an agreement to sell its Alberta operating assets and leases, at the end of 1997, the corporation still retained ownership over numerous technologies, patents, office space, a research facility, and land and continued to employ a team of engineers. It also planned to commercialize its TiO2S technology. At trial, Mr. Rendall himself acknowledged that, at that time, the technology retained by Solv-Ex had intrinsic value, which he expected would be realized in the future. Indeed, during the Solv-Ex bankruptcy proceedings in November 1997, Mr. Rendall agreed to convert his $2 million proof of claim to stock in the reorganized company. As the Tax Court stated, "[t]he existence of those retained assets and personnel suggest that, as of the end of 1997, Solv-Ex was in a position to continue its attempts to become a successful operating company after it emerged from bankruptcy."

Finally, the Rendalls' own contention that Solv-Ex was insolvent is not sufficient to demonstrate that the debt was worthless. Although insolvency may substantiate a claim of worthlessness, *see Cole*, 871 F.2d at 67, there are no financial statements or other documents in the record that reflect the corporation's position as of December 31, 1997. *Cf. Dustin v. Comm'r*, 53 T.C. 491, 501–02 (1969) ("The unsupported opinion of the taxpayer alone that the debt is worthless

-16-

will not usually be accepted as proof of worthlessness."). Moreover, even if the record supported the conclusion that Solv-Ex was insolvent at the end of 1997, this alone would not establish worthlessness because, as noted above, the possibility for future recovery existed. *See Roth Steel Tube Co. v. Comm'r*, 620 F.2d 1176, 1182 (6th Cir. 1980) ("Where a debtor company continues to operate as a going concern the courts have often concluded that its debts are not worthless for tax purposes despite the fact that it is technically insolvent.").

In short, the Rendalls have failed to demonstrate that in 1997 there was no reasonable hope of recovery on the loan to Solv-Ex. Therefore, the Tax Court did not clearly err in finding that the Rendalls are not entitled to a bad-debt deduction.[2] *See Cole*, 871 F.2d at 66–68.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the Tax Court's decision.

---

[2]Because we find that the Rendalls are not entitled to a bad-debt deduction, we need not decide whether the debt was a business or non-business debt. *See* 26 U.S.C. § 166(d).

-17-