T.C. Memo. 2001-39

UNITED STATES TAX COURT

GLENN H. AND DIANE J. FLOOD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12279-98.                    Filed February 21, 2001.

<u>Cheryl R. Frank</u> and <u>Gerald W. Kelly, Jr.</u>, for petitioners.

<u>David Delduco</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies and
accuracy-related penalties in petitioners' Federal income taxes
as follows:

|        |            | Penalty     |
| Year   | Deficiency | Sec. 6662(a) |
|--------|------------|-------------|
| 1991   | $9,459     | $1,892      |
| 1992   | 9,212      | 1,842       |
| 1993   | 23,323     | 4,665       |

The issues for our consideration are: (1) Whether petitioners' 1991, 1992, and 1993 income was underreported in the amounts of $28,195, $22,695, and $74,013, respectively; (2) whether petitioners are entitled to a 1992 bad-debt deduction under section 166;[1] (3) whether petitioners are entitled to a 1992 casualty loss deduction under section 165; (4) whether petitioners' 1992 gain from the sale of Glenwood Wrecker Service was understated in the amount of $10,635; and (5) whether petitioners are liable for the accuracy-related penalty under section 6662(a) for the 1991, 1992, and 1993 tax years.

### FINDINGS OF FACT[2]

When their petition was filed, petitioners Glenn H. and Diane J. Flood resided in Chatsworth, Georgia. Glenn H. Flood (petitioner) owned two businesses during the years in question, Flood's Auto Parts (FAP) and Glenwood Wrecker Service (Glenwood).

FAP

During the tax years in issue petitioner owned and operated FAP, a sole proprietorship located in Chatsworth, Georgia. FAP consisted of the wholesale and retail sale of auto parts, a wrecker service, and the sale of junk cars to a scrap metal

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable periods under consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties' stipulation of facts and exhibits is incorporated herein by this reference.

dealer. Petitioner recorded most of the gross receipts for FAP by creating invoices; however, he did not create an invoice for every sale. Petitioner had no other means to determine the amount of unrecorded receipts. Petitioner did not deposit all proceeds from sales into his business or personal bank accounts and also accumulated cash at his residence. Petitioner reported income for FAP on Schedule C, Profit or Loss From Business. For the years 1991, 1992, and 1993 FAP was petitioner's primary source of income.

Glenwood

On May 27, 1988, petitioner purchased Glenwood from Glenn Cantrell for $18,643 and initially operated the business as a sole proprietorship. An employee managed Glenwood until the employee's death that same year. Soon after the employee's death, petitioner agreed to form a partnership with Sam Hammontree (Hammontree), who subsequently became petitioner's brother-in-law. Hammontree planned to draw cash from his retirement fund to pay for a one-half partnership interest in Glenwood, but he was unable to obtain the funds. Instead, petitioner and Hammontree orally agreed that Hammontree would manage and receive a salary from Glenwood and pay petitioner from Hammontree's half of the business profits.

Petitioner and Hammontree filed a partnership tax return for Glenwood for the calendar year 1988. For the 1988 tax year, Glenwood reported ordinary losses of $517 and claimed $5,000 in section 179 expenses. Glenwood's Schedule K for 1988 reflected that petitioner and Hammontree each owned 50 percent of the partnership. Petitioners reported flowthrough activity from Glenwood for tax years 1988 through 1992 on their Forms 1040, U.S. Individual Income Tax Return.

Effective February 28, 1989, Glenwood became incorporated as Glenwood Wrecker Service, Inc., and the Glenwood partnership was terminated. The partnership assets and liabilities were exchanged for all of the issued stock in Glenwood. Additionally, a short-year partnership tax return was filed for the period ending February 28, 1989. The partnership reported ordinary income of $788 for the short tax year ending February 28, 1989. Petitioner's ending basis in Glenwood partnership and his beginning basis in Glenwood corporation was $13,914.

On April 25, 1989, petitioner and Hammontree personally guaranteed a bank loan to Glenwood in the amount of $43,080. The loan was secured by Glenwood's assets, which consisted of six tow trucks and one office trailer. Petitioner and Hammontree agreed that $29,788.59 should be removed from the corporation by Hammontree and paid to petitioner in payment for Hammontree's one-half interest in the business. The following day, April 26, 1989, petitioner received a $29,788.59 corporate check, signed by

Hammontree. Petitioner used the $29,788.59 to pay off outstanding debts of FAP.

For the short tax year beginning March 1, 1989, and ending December 31, 1989, Glenwood elected S corporation status. Glenwood filed Form 1120S, and reported ordinary income of $8,920 and claimed $8,900 in section 179 expenses. The Glenwood Form 1120S reflected that petitioner and Hammontree were 50-percent shareholders for the short tax year ending December 31, 1989.

During the examination of petitioners, respondent determined that the $29,788.59 received by petitioner was a distribution from Glenwood reducing petitioner's basis in Glenwood.

In July 1992, petitioner sold his one-half interest in Glenwood to Hammontree for $42,930. Petitioner received a cashier's check for $40,000 from Hammontree and a separate check directly from Glenwood for $2,930. Petitioners reported a capital gain from the sale of Glenwood stock in the amount of $19,344 on their 1992 Form 1040, U.S. Individual Income Tax Return. Respondent determined that petitioners understated their capital gain on the sale of Glenwood by $10,635.

The Murray Avenue Auction

In 1986, petitioner began working for the Murray Avenue Auction (the auction). The auction was wholly owned by petitioner's father, John Flood, until 1987. On January 1, 1987, petitioner's stepmother, Willene Flood, acquired an ownership interest in the auction and applied for a certificate of

registration with the Georgia Department of Revenue.

The auction's primary activity was selling items such as toys, tools, furniture, and collectibles that it acquired in bulk. Petitioner, a licensed auctioneer, worked at the auction and as a buyer, traveled to different locations to acquire the items subsequently sold at the auction. Petitioner's sister also worked at the auction.

Petitioner cosigned and made payments on several bank loans which were used for the benefit of his father and the auction. The total amount advanced to petitioner's father was $107,036. Petitioner did not have an ownership interest in the auction. In 1992, a fire completely destroyed the auction, for which petitioner's father and stepmother claimed a casualty loss deduction of $55,825 on their Form 1040 for the 1992 tax year.

Petitioners' Income as Determined by Respondent for 1991

For the tax year 1991, respondent, using the source and application of funds method, determined that petitioners had unreported income. To compute unreported income using this method, the funds petitioners used were identified through their expenditures during the tax year 1991 and then compared with petitioners' total available funds from all sources during the tax year 1991. Where the expenditures exceeded known available sources of funds, the difference was determined to be income. As part of the calculation, respondent excluded funds that were accumulated during prior taxable years.

To make his determination as to petitioners' income for
1991, respondent used the following information:

Source of funds:

| | |
|---|---:|
| Adjusted gross income | $19,283 |
| Loan balance 12/31/91 | 100,000 |
| Bank account balances 1/1/91 | 7,081 |
| Moneys advanced from daughter | 4,500 |
| Depreciation (noncash deduction) | 4,620 |
| Self-employment tax AGI deduction | 1,133 |
| Glenwood loan receivable | 31,301 |
| Cash on hand 1/1/91 | 3,000 |
| Total sources available | [1]170,918 |

Application of funds:

| | |
|---|---:|
| Personal living expenses | $23,780 |
| Loan balance 1/1/91 | 99,013 |
| Funds to construct house for daughter | 30,301 |
| Bank balance 12/31/91 | 284 |
| Payment of father's loan | 34,001 |
| Glenwood loan receivable 12/31/91 | -0- |
| Increase in inventory | 4,288 |
| Increase to capital/Glenwood | 4,379 |
| Building improvements | 6,067 |
| Cash on hand 12/31/91 | 3,000 |
| | |
| Total application of funds | 205,113 |
| Total sources available | 170,918 |
| | |
| Understatement of income | 34,195 |
| Less specific adjustments/rental income | (6,000) |
| | |
| Understatement of income | 28,195 |

[1] Although the parties have stipulated $170,915, it
appears the correct amount is $170,918.

Petitioners' Income as Determined by Respondent for 1992

For the tax year 1992, respondent, using the source and application of funds method, determined that petitioners had unreported income. To make his determination, respondent used the following information:

| Source of funds: | |
|---|---|
| Adjusted gross income | $26,805 |
| Loan balance 12/31/92 | 56,894 |
| Bank account balances 1/1/92 | 284 |
| Moneys advanced from daughter | 1,000 |
| Depreciation (noncash deduction) | 4,329 |
| Basis in asset sold | 20,656 |
| Cash on hand 1/1/92 | 3,000 |
| | |
| Total sources available | 112,968 |
| | |
| Application of funds: | |
| Personal living expenses | $24,093 |
| Loan balance 1/1/92 | 100,000 |
| Funds to construct house for daughter | 4,697 |
| Bank balance 12/31/92 | 1,667 |
| Increase in inventory | 5,000 |
| Increase to capital/Glenwood | 6,136 |
| Cash on hand 12/31/92 | 3,000 |
| | |
| Total application of funds | 144,593 |
| Total sources available | 112,968 |
| | |
| Understatement of income | 31,625 |
| Additional proceeds from sale of Glenwood | (2,930) |
| Sale of equipment | (6,000) |
| | |
| Understatement of income | 22,695 |

Petitioners' Income as Determined by Respondent for 1993

For the tax year 1993, respondent, using the source and application of funds method, determined that petitioners had unreported income. To make his determination, respondent used

the following information:

```
Source of funds:
    Adjusted gross income                   $15,154
    Loan balance 12/31/93                    52,210
    Bank account balances 1/1/93              1,667
    Depreciation (noncash deduction)         20,276
    Amount payable on equipment 12/31/93     21,328
    Self-employment tax deduction               848
    Cash on hand 1/1/93                        3,000

    Total sources available                  114,483

Application of funds:
    Personal living expenses                $21,980
    Loan balance 1/1/93                      56,894
    Bank balance 12/31/93                     3,250
    Increase in inventory                    67,868
    Equipment purchases                      35,504
    Amount payable on equipment 1/1/93         -0-
    Cash on hand 12/31/93                     3,000

    Total application of funds               188,496
    Total sources available                  114,483

    Understatement of income                 74,013
```

## OPINION

We consider here whether petitioners underreported income from the sale of a capital asset and from a business. We also consider whether petitioners are entitled to a bad debt and/or a casualty loss deduction. Finally, we must decide whether petitioners are liable for accuracy-related penalties.

Was Petitioners' 1991, 1992, and/or 1993 Business Income Underreported?

Respondent, using the source and application of funds method, determined that petitioners' income was underreported for the tax years 1991, 1992, and 1993 in the amounts of $28,195, $22,695, and $74,013, respectively. Petitioners contend that

respondent used an understated amount of cash on hand in the calculation of petitioners' business income.  A larger amount of cash on hand would reduce respondent's income determination under the source and application of funds method.

Taxpayers are required to keep adequate records with which the Commissioner may determine their correct tax liability.  See sec. 6001; sec. 1.6001-1(a), (d), Income Tax Regs.  In the absence of such adequate records, the Commissioner may reconstruct income using a method that clearly reflects income. See Cebollero v. Commissioner, 967 F.2d 986, 989 (4th Cir. 1992), affg. T.C. Memo. 1990-618; Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989).  The Commissioner may use indirect methods to reconstruct income, so long as they are reasonable in the circumstances.  See Holland v. United States, 348 U.S. 121, 126 (1954); Giddio v. Commissioner, 54 T.C. 1530, 1532-1533 (1970).

Respondent reconstructed petitioners' income using the source and application of funds method.  Petitioners do not question respondent's use of the source and application of funds method for reconstructing their income.  Petitioners argue, however, that respondent's determination of their income was overstated because respondent used too small an amount of cash on hand in the computation.  Petitioners do not question other aspects of respondent's calculations.  Accordingly, we must consider whether respondent erred in the reconstruction of petitioners' income only with respect to the amount of cash

petitioners maintained at their residence.

As part of the reconstruction of income using the source and application of funds method, funds that were accumulated before the first taxable year under examination must be excluded. During the examination, petitioner told respondent's agent that petitioners kept approximately $3,000 in cash at their residence. Relying on petitioner's representation, respondent used $3,000 in the reconstruction of petitioners' income.

Petitioners now contend that $3,000 does not represent the correct amount of cash on hand and that petitioners actually had as much as $30,000 in cash at their residence. The only evidence petitioners offered on this point was petitioner's oral testimony. On direct examination petitioner was asked: "Now today, with your knowledge of the facts, is that [$3,000] number accurate, or is it higher or lower?" Petitioner responded:

> I just prefer to leave it the same. I don't know. I couldn't tell you the truth about that. I'd just rather just leave it the same, but I probably had--I had to have more money than what I told him. That's the only thing I can say about it, but that's been a long time ago. Let's just leave it $3,000, and just let it ride like that. That's what I would say. [Emphasis added.]

Accordingly, petitioners have failed to show that respondent erred by using $3,000 as cash on hand.  Therefore, respondent's reconstruction of petitioner's income is upheld in full.

<u>Have Petitioners Shown That Advances to Petitioner's Father Were Loans and That They Became Worthless During 1992?</u>

We next consider whether petitioner is entitled to a section 166 bad-debt deduction for advances made to or on behalf of his father.  Petitioners argue that they are entitled to ordinary loss treatment because the advances were loans made in furtherance of petitioner's trade or business and that said loans became worthless when the auction was destroyed by fire in 1992.  Respondent argues that the advances petitioner made were gifts which did not have the requisite characteristics of a bona fide debt for the purposes of section 166.[3]

In order to maintain an ordinary loss deduction for a bad debt, a taxpayer must demonstrate that the advances qualify for section 166 treatment.  See <u>White v. United States</u>, 305 U.S. 281 (1938); <u>United States v. Virgin</u>, 230 F.2d 880 (5th Cir. 1956).  A taxpayer's entitlement to section 166 treatment depends upon a showing that a bona fide debt existed and that the debt became uncollectible during the year in which the deduction is claimed.  See sec. 166; Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111

---

[3] Petitioners did not claim this loss on their returns. Instead, the loss was claimed in an attempt to offset respondent's deficiency determination.  Because of our holding, this issue has no effect on the deficiency determined or the accuracy-related penalties.

(1933).  A bona fide debt is one that arises from a debtor-creditor relationship and is based upon a legally valid and enforceable obligation to pay a fixed or determinable sum of money.  See sec. 1.166-1(c), Income Tax Regs.

We have held that our consideration of whether a taxpayer created a debt with a true expectation of repayment and with the intent to enforce the repayment of that debt requires an examination of the facts and circumstances.  The following factors have been used to aid in deciding whether an advance is "debt" within the meaning of section 166:  (1) The existence of a promissory note or written evidence of indebtedness; (2) whether and in what amount interest is charged; (3) whether there is a fixed repayment schedule; (4) whether there is security or collateral for the debt; (5) whether the lender made a demand for repayment; (6) whether the loan is reflected as a loan in the parties' books and records; (7) whether and in what amounts any repayments have occurred; and (8) the solvency of the borrower at the time the parties made the loan.  See, e.g., Mayhew v. Commissioner, T.C. Memo. 1994-310.

Considering these factors in light of the record, we conclude that petitioners have not established the existence of a bona fide debt to petitioner.  Petitioners did not offer evidence of a promissory note or similar type of instrument of indebtedness that would identify the advances as loans.  Although petitioners reported $125 of interest income on their Form 1040

for the 1990 tax year, the source of that interest has not been shown. In addition, $125 of interest income is wholly disproportionate to the $107,036 that petitioner alleges he lent to his father.

Although petitioner's father owned assets other than the auction, such as rental property and the land on which FAP's business was situated, petitioner did not require security to guard against default. Further, petitioner did not protect his position to collect from his father's assets in the event of competing creditors. Petitioner did not seek collection or repayment from his father. Petitioner's testimony was that he did not ask his father for repayment because "he is my father".

Petitioner contends that his father made two lump-sum partial repayments and that those repayments are indicia of bona fide debt. However, there was no contemporary repayment schedule, and the only evidence of repayment was a handwritten schedule submitted for trial purposes. The schedule submitted for trial reflected that the first repayment of $19,505 was made to the lending bank and the second repayment of $13,000 was made to petitioners.

We review transactions between family members with heightened scrutiny. See Caligiuri v. Commissioner, 549 F.2d 1155, 1157 (8th Cir. 1977), affg. T.C. Memo. 1975-319; Perry v. Commissioner, 92 T.C. 470, 481 (1989), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990). Loans between family

members have been considered gifts in the absence of sufficient evidence of a true expectation of repayment and intent to enforce collection of the debt. See <u>Perry v. Commissioner</u>, <u>supra</u> at 481; <u>Estate of Reynolds v. Commissioner</u>, 55 T.C. 172, 201 (1970); <u>Estate of Van Anda v. Commissioner</u>, 12 T.C. 1158 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). Even if petitioner's father made the two payments reflected in the trial exhibit, that evidence is insufficient, by itself, to show the existence of bona fide debt.

Had petitioners shown that a bona fide debt existed, they would not have been entitled to a deduction for the tax year 1992 because petitioners did not show worthlessness in that year. See sec. 166(a)(1). In determining the worthlessness of a debt, all available evidence including the value of any security and the financial condition of the debtor must be considered. See sec. 1.166-2(a), Income Tax Regs. A taxpayer must provide evidence of the worthlessness of the debt. See sec. 1.166-2(b), Income Tax Regs. A debt becomes worthless in the tax year in which a creditor, using sound business judgment, abandons all reasonable hope of recovery on the basis of the available information regarding the surrounding circumstances of the debt. See <u>Crown</u>

v. Commissioner, 77 T.C. 582, 598 (1981); Andrew v. Commissioner, 54 T.C. 239, 248 (1970); sec. 1.166-2(a), Income Tax Regs.

Petitioners argue that the loans became worthless in 1992 when the auction was destroyed by fire. Petitioner argues that the auction was his father's sole source of income, the destruction of which resulted in an inability to repay the advances. It is not entirely clear from the record who owned the auction at the time of the fire. It appears from the record, however, that the auction was owned entirely by petitioner's father and/or stepmother.

Although legal action by petitioner against his father is not required to show his father's inability to repay the advances, in the absence of such action, petitioner must still show that legal action would not have resulted in the satisfaction of the debt. See sec. 1.166-2(b), Income Tax Regs. Petitioner's father owns the land upon which FAP is located. Schedule D, Capital Gains and Losses, of John and Willene Flood's 1992 income tax return shows the sale of a building for a gain of $30,000, 2 weeks before the auction fire. Additionally, Schedule E, Supplemental Income and Loss, of the 1992 income tax return shows that the couple owned rental property at the time of the fire.

Accordingly, petitioners have failed to show that the advances were loans. Even if petitioners had shown that the advances were debt within the meaning of section 166, petitioners

have not shown that they became worthless during 1992.

## Are Petitioners Entitled to a Casualty Loss Deduction?

We next consider whether petitioners are entitled to a casualty loss deduction under section 165 for losses stemming from the destruction of the auction. Petitioners advanced their casualty loss argument for the first time in their brief as an entirely new and separate issue. After considering that this issue was not tried by consent of the parties and that surprise and prejudice to respondent would result, we hold that the issue was not timely raised. See Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973). Petitioners' casualty loss argument appears to be an afterthought. Petitioners have not shown that they had an ownership interest in the auction. Additionally, petitioners' argument conflicts factually with petitioner's father's and stepmother's claim of a $55,825 casualty loss for the same property.

## Petitioner's Basis in Glenwood

We next consider whether petitioners have shown that they correctly reported capital gain from the 1992 sale of Glenwood. Section 1001(a) provides that gain from the sale or disposition of property shall be the excess of the amount realized over the adjusted basis. Section 1001(b) provides that the amount realized is the sum of money received plus the fair market value of any property received. Section 1001(c) requires that the amount of gain on the sale or exchange of property be recognized

unless there are specific provisions for nonrecognition.

Respondent determined that petitioners understated their capital gain from the sale of Glenwood by $10,635. The increased capital gain results, in part, from respondent's characterizing a $29,788.59 check from Glenwood to petitioner as a distribution which reduced petitioner's basis in Glenwood to zero. The issue before us is purely factual.

Petitioners argue that the $29,788.59 was a distribution to Hammontree from Glenwood and, in turn, a payment to petitioner in exchange for Hammontree's acquisition of a 50-percent interest in Glenwood from petitioner. We agree with petitioner. In 1988 petitioner and Hammontree agreed that Hammontree would use funds from a retirement account to become a 50-percent partner in Glenwood. However, Hammontree was unable to draw from the account. Thereafter, it was understood that Hammontree would run the business and take a salary and that petitioner's one-half interest in Glenwood would be paid for from Hammontree's profit and/or salary from the partnership. Glenwood's Federal income tax returns for 1988 and short year 1989 reflect a 50-50 partnership. Early in 1989, however, Glenwood was incorporated, the partnership was discontinued, petitioner and Hammontree became equal shareholders, and petitioner had not been paid for

Hammontree's 50-percent ownership in Glenwood. Around that time, petitioner's basis in his Glenwood shares was $13,914.

On April 25, 1989, petitioner and Hammontree personally guaranteed a loan in Glenwood's name for $43,080 which was secured by Glenwood's operating assets. On April 26, 1989, in accord with the original agreement of petitioner and Hammontree, petitioner received a $29,788.59 payment from Glenwood. It was their understanding that the $29,788.59 paid to petitioner was Hammontree's payment for one-half of the shares in Glenwood.

In a July 1992 purchase of petitioner's remaining 50-percent interest in Glenwood, Hammontree used corporate funds to finance a portion of the transaction, showing a pattern in the way petitioner and Hammontree orchestrated their affairs. Considering the record as a whole, the $29,788.59 payment was a payment from Hammontree for petitioner's interest in the business.[4] Accordingly, we hold that the $29,788.59 payment was not a corporate distribution to petitioner and that it was from Hammontree.[5]

---

[4] We are not required here to consider what effect Hammontree's withdrawal of $29,788.59 from Glenwood had on Hammontree's tax situation.

[5] The extent to which our holding has any effect on petitioner's basis in Glenwood's stock should be determined by the parties under Rule 155.

Section 6662(a)--Accuracy-Related Penalty

Finally, we consider whether petitioners are liable for an accuracy-related penalty under section 6662(a). Respondent determined that a 20-percent accuracy-related penalty, based on negligence, applied to the entire income tax deficiency for the 1991, 1992, and 1993 tax years.

An accuracy-related penalty is imposed by section 6662(a) in an amount equal to 20 percent of the amount of the underpayment that is attributable to negligence. See sec. 6662(b)(1). "Negligence" is the failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Sec. 6662(c).

A taxpayer is negligent where he fails to exercise due care or fails to do what a reasonable and ordinarily prudent person would do under similar circumstances. See Neely v. Commissioner, 85 T.C. 934, 947-948 (1985).

Petitioners contend that they were not negligent and should not be subject to the accuracy-related penalty because they provided sufficient records containing FAP's major tranactions to their return preparer, leaving out only the minor sales. Respondent contends that petitioners were negligent when they failed to record and report all of FAP's sales transactions.

Petitioner did not maintain adequate books and records for FAP. Petitioner testified that sales, from $1 to $10, were regularly omitted from recordkeeping and that FAP employees may

also have forgotten to record other sales of unknown amounts. Petitioner's testimony reveals that he was aware that invoices may not have been prepared for a number of larger items sold by FAP. Petitioner used the understated amount reflected by the invoices to prepare summary sheets which he then provided to the return preparer. Petitioner failed to inform the return preparer that certain sales were omitted. In addition, petitioner did not always deposit the proceeds from FAP's sales into a bank account; therefore, there was no record of some portion of the sales.

Petitioners also contend that these unrecorded and unreported sales were of minor consequence. However, respondent's reconstruction of petitioners' income reflects relatively sizable amounts of omitted income. As to the remaining items making up the deficiency, apart from the capital gain item, petitioners did not make any argument as to why respondent's determination was in error or that their return position was reasonable. Therefore, we find petitioners liable for the accuracy-related penalties on the resulting income tax deficiencies.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>